IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRETT CURTIS, as heir at law and administrator of the ESTATE OF JOSEPH CURTIS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 10 C 4570 |
| TRANSCOR AMERICA, LLC, | ) ) | |
| Defendant. | ) ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff Brett Lee Curtis ("Plaintiff") brings this wrongful death action against defendant TransCor America, LLC ("TransCor"), a prisoner transport company, alleging that TransCor is liable for damages resulting from the death of Plaintiff's father, Joseph Curtis ("Curtis"), while in TransCor's custody on June 23, 2009. Pending before the court are three motions related to Curtis's requested relief. For the reasons stated herein, "Plaintiff's Motion for Determination of Choice of Law Relating to the Issues of Liability and Compensatory Damages" (Dkt. No. 155) is granted; "Plaintiff's Motion to Allow Punitive Damage Relief Under Rule 54(c)" (Dkt. No. 169) is granted; and "Defendant TransCor America, LLC's Motion for Application of Indiana Law on Liability and Compensatory Damages and Inapplicability of Rule 54(c) Relief" (Dkt. No. 171) is denied.

BACKGROUND

1

The court begins by noting that the two parties have differed in their procedural approaches to the choice of law question now pending before the court. TransCor approached the choice of law question as "dispositive," and filed a Local Rule 56.1(a)(3) statement of material facts in support of its motion. Plaintiff did not file a statement of material facts, nor did Plaintiff file a Local Rule 56.1(b)(3) response to TransCor's statement. Despite this procedural confusion, the court has been able to sort through the briefing and exhibits submitted by the parties to determine that the following facts are undisputed, unless otherwise noted.

A.    Events in Kansas and Missouri

On the morning of June 23, 2009, at approximately 1:20 a.m., federal prisoner Joseph Curtis boarded a TransCor vehicle in Leavenworth, Kansas for transport to the Federal Correctional Complex in Terre Haute, Indiana ("FCC Terre Haute"). The driver of the TransCor vehicle (which is known as a "Transporter") was TransCor employee Wanda Robinson. Also aboard the Transporter were TransCor employees Kenneth Boyd, Glenn Evans, and Kirby Jeffreys.[1] Prisoners aboard the Transporter included Thomas Casey, Dennis Coleman, Robert Davisson, Daniel Dexter, Terrance Hayes, Russell Harrison, Adam Kaminski, and seventeen others, along with Joseph Curtis. The Transporter, which included both a cab and a "prisoner and agent compartment" approximately the size of a motor home, was equipped with two roof-top air conditioning units.

The parties dispute whether TransCor employees knew at the time the Transporter left

_____

[1] Although TransCor uses the spelling "Jeffries," the court has chosen to use the spelling "Jeffreys" as exhibited in the relevant deposition document.

Leavenworth that one of the two air conditioning units was broken. Boyd and Evans both testified at their depositions that they became aware of this fact sometime during transit, at which point they called TransCor's headquarters. (*See* Def.'s Ex. 23 ("Boyd Dep.") at 66-67; Def.'s Ex. 26 ("Evans Dep.") at 39, 42-43.) On the other hand, prisoner Casey recalled a TransCor officer telling the inmates in Leavenworth, "You boys are going to have a long ride. There's no air-conditioning in the bus." (Pl.'s Ex. 6 & 3A[2] ("Casey Dep.") at 5.) Similarly, prisoner Dexter testified that "[the guards] said that's why they were picking us up in the middle of the night, because the air conditioning wasn't working so well." (Pl.'s Ex. 5 ("Dexter Dep.") at 17.) Prisoner Harrison testified that the "TransCor people" were "sitting there telling us that the air conditioner is broke when they're picking us up from Leavenworth and it would take too long to get another bus here, so they're going to go ahead and transport us." (Pl.'s Ex. 7 ("Harrison Dep.") at 10.)[3]

From approximately 1:20 a.m. until 6:10 a.m., the Transporter traveled from Leavenworth, Kansas, across Missouri along Interstate-70, and into southern Illinois.[4] About

---

[2] For many witnesses, Plaintiff included additional pages of the deposition transcript as support for his response to TransCor's motion. (*See generally* Dkt. No. 184, Attachments.) Unfortunately, Plaintiff numbered these "Exhibits 1-17," despite the fact that Plaintiff had already filed "Exhibits 1-20" in support of his own motion. For ease of reference, the court designates the exhibits filed with Plaintiff's response as Pl.'s Ex. 1A, Pl.'s Ex. 2A, etc..

[3] TransCor argues that this testimony is inadmissible hearsay. (Dkt. No. 188 ("Def.'s Reply") at 8 n. 12.) Applying Federal Rule of Evidence 801(d)(2), and assuming that the statements were made by TransCor employees in their capacity as agents for TransCor, the court finds that they are statements made by a party opponent and therefore are not hearsay.

[4] The Transporter was equipped with a ZONAR GPS system which recorded the exact coordinates of the vehicle, the state within which those coordinates can be found, direction, speed, and mileage throughout the transport, as well as the time (recorded in Central Standard Time) of each data reading. (Dkt. No. 173 ("Def.'s SMF") ¶ 10.)

thirty minutes into the trip, in Kansas City, Kansas, the Transporter stopped for a driver change, and Jeffreys took over driving responsibilities from Robinson.

Prisoner Kaminski testified that "several times . . . during the night," Curtis "was complaining to the officer that he had a hard time breathing." (Pl.'s Ex. 9 ("Kaminski Dep.") at 10.) According to Kaminski, a black, male officer came to the back of the vehicle while in transit and "just looked at Curtis, and he just said he's going to be okay. It's not – just breathe, and that's it." (*Id.* at 11.) At the time, Curtis was "very white." (*Id.*)

B.     Events in Illinois

Shortly after crossing the Missouri/Illinois border, the Transporter stopped at a McDonald's in Pontoon Beach, Illinois, to refuel and to allow the prisoners to use the restroom and have breakfast. According to prisoner Coleman, who was seated directly behind Curtis, Curtis did not eat or drink anything during the McDonald's stop. (Pl.'s Ex. 8 ("Coleman Dep.") at 23.)

Boyd gave Curtis his medications at approximately 6:45 a.m., and Curtis signed a form to indicate that he had, in fact, received his medications. (Def.'s SEALED Ex.28.) Prisoner Coleman recalls that, when the guards came around to pick up the McDonald's trash, Curtis told a TransCor guard, "I need my medications. I don't feel good.," and the guard responded, "We don't have any more for you." (Coleman Dep. at 26.) Boyd does not recall speaking to any prisoner about the prisoner not getting all of his medications. (Boyd Dep. at 51-52.) Prisoner Casey testified that, during the McDonald's stop, Curtis was "at the stage of asphyxiation, maybe" with "foam coming out of his mouth and white mucus coming out of his nose," and that the guards were informed of Curtis's status. (Casey Dep. at 7.)

4

Around 7:42 a.m., Evans called TransCor trip manager, John Steidinger. to inform him that the back air conditioning unit was not cooling. (Boyd Dep. at 66-67; Evans Dep. at 42-43; Pl.'s Ex. 4 ("Steidinger Dep.") at 8-10.) Steidinger referred the call to his supervisor, Charles Westbrook. (Steidinger Dep. at 10-11.) Westbrook decided to have the agents continue the trip, because time to replace the vehicle would take longer than the remaining travel time to Terre Haute. (*Id.* at 11.) At that time, the temperature was approximately 85° F. At approximately 7:53 a.m., after the McDonald's stop, the Transporter resumed its trip.

The Transporter next made a scheduled stop at the federal prison in Greenville, Illinois, to drop off three prisoners. During the stop at Greenville, prisoner Hayes, who was sitting next to Curtis and was chained to him, noticed that Curtis was "sleeping at some times" and "sweating bad," but did not appear to be in any kind of medical distress. (Pl.'s Ex. 10 ("Hayes Dep.") at 18.) The Transporter departed from Greenville at approximately 9:12 a.m. The outside temperature was 86° F.

After leaving the prison in Greenville, the Transporter continued eastward from Greenville along I-70 for approximately 90 miles before crossing into Indiana. During this time, Robinson and Evans were in the sleeper berths and Boyd was on duty supervising the prisoners. Jeffreys was in the cab of the vehicle, which is a separate compartment with a separate air conditioning unit. The peak temperature recorded along the Transporter's route on June 23, 2009 was 91° F.

C.      Events with Location in Dispute

The specific location and timing of the following events are in dispute. It is undisputed,

however, that TransCor guards were notified that Curtis was in distress sometime after leaving the detention center in Greenville, Illinois, and before stopping in a parking lot at the Honey Creek Shopping Center (the "Mall") in Terre Haute, Indiana.

According to prisoner Coleman, at some point "about a half hour or so" after the guards came by to pick-up the McDonald's trash, and after the Greenville stop, Curtis "became totally unresponsive." (Coleman Dep. at 27.) Coleman then left his seat and told a TransCor guard "I think he's dying or something . . . This old man is really bad.," and he asked the guard to "come check him out." (*Id.*) The guard responded that he would "be back there in a few minutes." (*Id.*) As he was returning to his seat, Coleman noticed that Curtis was "white as a ghost . . . you could see a little blue around his ears, around his cheeks . . . [with] a grayish or a blackish color to the blue." (*Id.* at 76-77.) Coleman then attempted to talk to Curtis through the gap between the seats. (*Id.* at 28.) He heard Curtis exhale loudly, and did not see Curtis move again. (*Id.*) Coleman testified that a white, male TransCor guard came back to Curtis's seat about ten or fifteen minutes after speaking to Coleman, checked for Curtis's pulse, and poured a bottle of water on the back of Curtis's neck. (*Id.* at 29, 76.) The guard stated that they would be in Terre Haute "in about an hour and a half." (*Id.* at 29.) Similarly, prisoner Davisson testified that Curtis "slumped over" in his seat "probably around 9-ish, between 9 and 10, I believe." (Pl.'s Ex. 6A ("Davisson Dep.") at 14.)

Prisoner Hayes noticed Curtis begin to shake "right after leaving Greenville." (Hayes Dep. at 19.) Hayes estimated that the seizures lasted "about two long minutes." (*Id.* at 59.)

Hayes notified a guard of Curtis's distress,[5] and the guard came back "a couple minutes later." (*Id.* at 20, 59.) At that point, the guard unhooked Hayes from Curtis, and moved Hayes to a different seat. (*Id.* at 20.) According to Hayes, it was "at least 20 minutes" after Curtis began to shake that the Transporter stopped in the parking lot of the Mall. (Pl.'s Add'l Exhibits, Ex. 8 ("Hayes Add'l Dep.") at 19, 21.)[6]

According to prisoner Kaminski, at some point during the transit, various prisoners "started yelling at the guards that [Curtis] doesn't look so good." (Kaminski Dep. at 14.) The prisoners told the guards to "call an ambulance," saying things like, "The guy's dying. He's white. He doesn't move. He's not moving. He's not breathing." (*Id.* at 15, 17.) Kaminski observed at that time that Curtis was not moving or breathing. (*Id.* at 17.) The TransCor guards responded that they would be in Terre Haute in "about a half an hour" or "in a little while." (*Id.* at 14-15.) About half an hour later, the Transporter stopped at the Mall. (*Id.* at 16-17.)

According to prisoner Casey, "for about an hour, [Curtis's] breathing was labored. And after about 15 minutes, we called for help." (Casey Dep. at 23.) Casey testified that "everybody was getting kind of riled up on the bus," yelling that "[t]he guy's dying." (*Id.* at 10.) Casey estimates that it was over an hour later that the Transporter stopped in the Mall parking lot. (*Id.* at 11.)[7]

---

[5] Hayes did not leave his seat, as he was chained to Curtis at that time. Other cited testimony clarifies that Hayes yelled out to the guards. (*See, e.g.,* Evans Dep. at 46-47.)

[6] Later during his deposition, Hayes estimated that it took six or seven minutes for the guards to come back and unchain him from Curtis, and then "another 13 to 15 minutes . . . [before] the bus actually stopped." (Hayes Dep. at 53-54.)

[7] When asked to give a time frame for his statement "For about an hour, his breathing was labored. Afer about 15 minutes, we called for help," Casey responded "I would say that's when we got on to the shopping center." (Casey Dep. at 23.) The court interprets this statement

Prisoner Harrison estimated that approximately half an hour passed between the time the prisoners started yelling about Curtis's condition and the time the Transporter stopped in the Mall parking lot. (Harrison Dep. at 15-16.)

Boyd testified that he checked on Curtis after hearing a prisoner "yell out." (Boyd Dep. at 59.) Boyd first "hollered for Master Sergeant Evans to get up out of the bunk," and then proceeded to enter the secured prisoner area. (*Id.* at 59-60.) Boyd then unhooked Hayes and had him move to another seat, and "did a pulse" and "checked on [Curtis's] chest, listening for a heart beat, and to see if I could feel a breath of air on my cheek." (*Id.* at 60.) At that point, Boyd "felt a breath on [his] cheek," as well as "a weak pulse." (*Id.* at 71, 73.) Boyd poured water on Curtis, but Curtis was "unresponsive." (*Id.* at 64.) Curtis remained unresponsive "the whole time" that Boyd was with him, from Hayes's initial shout until the Transporter arrived at FCC Terre Haute. (*Id.* at 81.) Boyd did not notice any perspiration on Curtis. (*Id.* at 72.) Regarding the location and timing of these events, Boyd recalled that, at the time he entered the secured prisoner area, the Transporter "was easing to a stop" and "had already pulled off into the parking lot area." (Boyd Dep. at 60-61.) Boyd also testified via affidavit that, "[a]t the time the transporter entered the state of Indiana, there had been no notification of prisoner Curtis being overheated or in a distressed medical condition." (Def.'s Ex. 32 ("Boyd Aff.") ¶ 7.)

Evans, who was in the sleeping berth, recalls that "around 11:00" a prisoner "shouted out . . . that one of the inmates was having a seizure." (Evans Dep. at 46.) He allowed Boyd to "go back in the back to see what was going on," and then watched Boyd as he checked on Curtis. (*Id.* at 47.) Evans also called trip management, as well as his supervisor, Westbrook. (*Id.* at 49-

---

to mean that the Transporter headed towards the Mall after the prisoners called for help.

50.)  As Evans recalled, "[a]t the time, we were very close to the facility.  And after [Westbrook] having a conversation with whomever he had a conversation with, he directed me to go ahead on to the facility."  (*Id.* at 50-51.)  Evans then called FCC Terre Haute and "explained to them that we had a medical emergency."  (*Id.* at 52.)[8]  Like Boyd, Evans testified via affidavit that, "[a]t the time the transporter entered the state of Indiana, there had been no notification of prisoner Curtis being overheated or in a distressed medical condition."  (Def.'s Ex. 33 ("Evans Aff.") ¶ 10.)

Jeffreys, who was driving the Transporter, recalled that "the officer in charge[9] instructed [him] to pull over, that someone was feeling ill."  (Def.'s Ex. 27 ("Jeffreys Dep.") at 14.)  Jeffreys stated that this happened "around 11:00" and took place "when we were in Indiana."  (*Id.* at 14-15.)

D.     Events in Indiana

TransCor's Director of Planning, James Crouch, filed an affidavit interpreting the data generated by the Transporter's GPS tracking system.  (Def.'s Ex. 14 ("Crouch Aff.").)[10]  According to Crouch's interpretation of the data, the Transporter crossed the state line between Illinois and Indiana on I-70 at 10:57:19 a.m.  (*Id.* ¶ 10.)  At 11:04:54 a.m., the Transporter

---

[8] Evans further testified at his deposition "I don't know what specifically was said." (Evans Dep. at 52.)  Michael Miller, an employee of FCC Terre Haute, recalled being told by "a staff member on the phone" that "they had an inmate that wasn't feeling very well."  (Pl.s' Ex. 14A ("Miller Dep.") at 6.  The court expresses no opinion as to the admissibility of Miller's testimony on this point.

[9] It is undisputed that the officer in charge was Evans.  (*See*, *e.g.*, Def.'s Ex. 13 ("Robinson Dep.") at 25, 52-53.)

[10] Plaintiff does not dispute the accuracy of these readings.  (*See* Def.'s Ex. 29 ("Pl.'s Admissions") ¶ 27.)

stopped at the bottom of the Exit 7 off-ramp from I-70 to US-150 in Terre Haute, Indiana. (*Id.* ¶ 11.) At 11:06:07 a.m., the Transporter made an unexpected stop on the shoulder of US-150 for 11 seconds. (*Id.* ¶ 12.) At 11:07:06 a.m., the Transporter stopped in the Mall parking lot. (*Id.* ¶ 13.)

After stopping at the Mall parking lot, Jeffreys drove the Transporter to FCC Terre Haute, which was at that point just two miles away. (Jeffreys Dep. at 20-21.) Jeffreys estimated that it took "probably less than five" minutes to get to the prison from the Mall. (*Id.* at 21.) Crouch opined that the Transporter left the Mall parking lot at 11:09:46 a.m., and arrived at the parking lot outside FCC Terre Haute at 11:16:21 a.m. (*Id.* ¶¶ 14-15.)

It is undisputed that after the Transporter arrived at FCC Terre Haute, it took approximately 18 minutes for the Transporter to drive to the rear gate and clear security. (Def.'s SMF ¶ 23.) BOP medical personnel then boarded the Transporter, assessed Curtis's vital signs, and transferred him to the prison's urgent care center after performing CPR. Dr. Thomas Webster, who worked in the urgent care center, testified that Curtis was "deader than a doornail" by the time Dr. Webster saw him. (Pl.'s Ex. 18 ("Webster Dep.") at 13.)

Virgo County Coroner Roland M. Kohr performed an autopsy on Curtis on June 24, 2009. In his report, Dr. Kohr noted that Curtis had been exposed to "prolonged heat exposure in a non-air conditioned bus" and concluded that the cause of Curtis's death was "heat stroke." (Pl.'s Ex. 1 ("Autopsy") at 1.) The Certificate of Death states that the "approximate interval: onset to death" was "hours," but also states that Curtis's "injury" occurred on "Interstate I-70" in "Illinois" at "noon." (Pl.'s Ex. 2 ("Death Cert.") Boxes 28, 35-36, 38.)

D.     Additional Contacts

It is undisputed that TransCor is headquartered in Nashville, Tennessee; that Curtis was a resident of Iowa, where his estate is being probated; and that Plaintiff is a resident of Minnesota and executor of Curtis's estate.

## I.     CHOICE OF LAW REGARDING LIABILITY AND COMPENSATORY DAMAGES

### LEGAL STANDARD

As set forth in this court's March 29, 2012 Memorandum Opinion and Order addressing choice of law issues related to Plaintiff's proposed punitive damages claim (Dkt. No. 159 ("03/29/2012 Order")), a federal court sitting in diversity applies the substantive law of the forum state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941). In Illinois, that means following the Restatement (Second) of Conflict of Laws and its "most significant relationship" test. *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 898, 901 (Ill. 2007).

The court begins its analysis by identifying a conflict of laws that impacts a particular issue before the court. *Id.* Once a relevant conflict of laws has been identified, the court must then "(1) choose[ ] a presumptively applicable law under the appropriate jurisdiction-selecting rule, and (2) test[ ] this choice against the principles of § 6 in light of relevant contacts identified by general provisions like § 145 (torts)." *Id.* at 903 (quoting R. Crampton, D. Currie & H. Kay, Conflict of Laws: Cases—Comments—Questions 120 (5th ed. 1993).) In wrongful death actions, the court begins with a presumption that the law of the state where the injury occurred will govern. *See id.* (personal injury generally)*; see also* Restatement (Second) of Conflict of Laws § 175 (1971) (wrongful death). This presumption can only be overcome by showing that

another state has "a *more* or *greater* significant relationship" to the dispute and the parties. *Townsend*, 879 N.E.2d at 903 (emphasis in original).

The overall objective of the Second Restatement is to identify the state with the most significant relationship to the dispute and the parties, by applying the guiding principles set forth in § 6 to the specific contacts set forth in § 145. *Id.* at 900-902. In performing this analysis, the court considers "the relevant policies of all potentially interested states and the relevant interests of those states in the decision of the particular issue." *Id.* at 901.

The principles of § 6 include: "(a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relevant interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic principles underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied." *Id.* at 900 (quoting Restatement (Second) of Conflict of Laws § 6, at 10 (1971)).

The specific contacts identified in § 145 are: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* at 901 (quoting Restatement (Second) of Conflict of Laws § 145(2), at 414 (1971)).

## RESOLVING DISPUTED QUESTIONS OF FACT

One wrinkle in this case involves the court's ability to resolve disputed questions of fact at this stage of the litigation. Generally, "at the summary judgment stage, 'the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Shaffer v. Am. Medical Ass'n*, 662 F.3d 439, 443 (7th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Here, however, both parties urge the court to affirmatively address and resolve any relevant factual disputes. (Dkt. No. 172 ("Def.'s Mem.") at 1 ("the *Restatement* factors relevant to a choice of law analysis allow, and in fact, require the Court to resolve any factual disputes") (citing *Nautilus Ins. Co. v. Reuter*, 537 F.3d 733, 742 (7th Cir. 2008); Dkt. No. 184 ("Pl.'s Choice of Law Resp.") at 10 n.9 ("The Illinois Supreme Court holds that choice of law issues should be let to the judge.") (citing *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893 (Ill. 2007)).)

In *Townsend,* the Supreme Court of Illinois recognized that "the methodology of the Second Restatement of Conflict of Laws may raise factual issues." *Townsend*, 879 N.E.2d at 898. The court did not, however, address the question of how or when factual disputes should be resolved, choosing instead to emphasize that "the task of evaluating and balancing the choice-of-law principles embodied in the Second Restatement, as they apply to the facts, is a matter of law . . . properly left to the judge." *Id.* Moreover, the trial court in the underlying case "did not hold an evidentiary hearing, weigh the testimony or assess the credibility of witnesses . . . [but] base[d] its decision on documentary evidence." *Id. Townsend* therefore leaves open the question of whether the Supreme Court of Illinois would endorse more in-depth judicial fact finding at this stage in the proceedings.

In *Nautilus*, the Seventh Circuit explicitly stated "we are of the opinion that the district

court must . . . resolve factual disputes that bear on the choice-of-law determination." *Nautilus*, 537 F.3d at 742. The court recognized that "[i]t might seem odd to charge the district court with resolving a factual dispute that could affect the rights and liabilities of the litigants," but also emphasized the unique position of the district court. *Id.* at 743. "Without knowing which state's substantive law governs the dispute, the case cannot move forward. But without resolving the contested issues . . . the choice-of-law determination cannot be made." *Id.*

This court has previously noted its reluctance to engage in pre-trial judicial fact finding with regard to "the central factual issues of Plaintiff's claims," such as "when, where, and how Curtis died." (Dkt. No. 32 ("12/20/2010 Order") at 3.) The court nevertheless concludes that it is necessary and proper for the court to resolve the narrow question of fact presented by the pending motions, as set forth in the analysis that follows.

<u>ANALYSIS</u>

1.    <u>Conflict of Laws</u>

The court begins its analysis by identifying a conflict of laws that impacts a particular issue before the court. *Townsend*, 879 N.E.2d at 898. In this case, the parties agree that there is no relevant conflict of laws with respect to the issue of liability, and that Illinois law therefore applies. (*See* Dkt. No. 156 ("Pl.'s Choice of Law Mem.") at 11-12 (citing relevant state laws and finding no conflict); Def.'s Mem. at 1 (agreeing with Plaintiff's analysis "with respect to both the survival and wrongful death claims")[11].) The parties also agree that there *is* a conflict of laws

_____

[11] TransCor only explicitly addresses the conflict of laws with respect to compensatory damages. Because TransCor has made no argument that Illinois law should not apply to the issue of liability, the court assumes that TransCor agrees with Plaintiff's analysis on this point of law. (*See* Def.'s Mem. at 1 (arguing only that "the Court must make a determination as to which law applies to Plaintiff's claims for compensatory injuries").)

with respect to the issue of compensatory damages.

Specifically, while Illinois and Indiana both allow a cause of action for wrongful death, Indiana's wrongful death statute "differs from Illinois law in that Indiana law (a) Prohibits recovery of damages awarded for a surviving heir's grief and sorrow; (b) Prohibits recovery for a deceased person's pain and suffering; (c) Caps damages awarded for the loss of love and companionship at $300,000.00; and, (d) Requires a child claiming the loss of a parent's love and companionship to prove that he or she had a genuine, substantial and ongoing relationship with the parent before the recovery of such damages."  (Pl.'s Choice of Law Mem. at 13 (comparing 740 ILCS 180/2 & Ind. Code § 34-23-1 (1998)).)  Similarly, while Illinois survival law "provides that a decedent's estate is entitled to the same compensatory damages that the decedent would have been entitled to up to the time of death," including damages for "conscious pain and suffering, lost earnings, medical expenses, loss of consortium, physical disability, and property damage," Indiana law "prohibits recovery for personal injury to a party who dies as a result of the negligence of another."  (*Id.* (citing 755 ILCS 5/27-6 and Ind. Code § 34-9-3-1 (1989)).)  In TransCor's words, "Indiana prohibits any survival-type claim for the decedent's pre-death pain and suffering."  (Def.'s Mem. at 1.)

2.    Presumptive Choice of Law

Having identified the relevant conflict of laws, the court now must "choose[ ] a presumptively applicable law under the appropriate jurisdiction-selecting rule."  *Townsend*, 879 N.E.2d at 903.  As noted above, in wrongful death actions the presumption is that "the local law of the state where the injury occurred determines the rights and liabilities of the parties."  Restatement (Second) of Conflict of Laws § 175 (1971).  Here, the parties hotly contest whether

Curtis's "injury" occurred in Illinois or Indiana.

Plaintiff takes the position that "Curtis began suffering his injuries in Illinois and possibly died in Illinois," concluding that "Illinois definitely was a place of injury but the same cannot be said of Indiana if Joseph Curtis died before reaching Indiana." (Pl.'s Choice of Law Mem. at 14.) In this manner, Plaintiff distinguishes between Curtis's "injury" and his "death." For purposes of the court's conflict of laws analysis, Plaintiff argues that Curtis's "injury" consists of his "pre-death pain and suffering" as measured by "the onset of heat stroke." (Pl.'s Choice of Law Resp. at 9-10; Pl.'s Choice of Law Mem. at 8.) Plaintiff argues that these events took place in Illinois. (Pl.'s Choice of Law Mem. at 8, 14; Pl.'s Choice of Law Resp. at 11.)

TransCor, in its initial round of briefing, asserts that Curtis's "indivisible 'injury'" is his death, criticizing Plaintiff for "mistak[ing] the conduct contributing to the injury for the injury itself." (Def.'s Mem. at 2.) Urging the court to find that Curtis "showed signs of life" while in the State of Indiana, TransCor concludes that "the place of death, in this case, Indiana, should be determinative." (*Id.* at 3.) It its reply brief, however, TransCor seems to take a different approach. Relying on the comments to § 175 of the Second Restatement, TransCor concedes that "the Court must . . . look at when the conditions to which Curtis was subjected 'first [took] effect on the person,'" and quotes Comment b as stating, "[t]his place is not necessarily that where the death occurs." (Def.'s Reply at 3-4 (quoting Restatement (Second) of Conflict of Laws § 175 cmt. b (1971)).) TransCor concludes that Indiana law nevertheless applies, because "[t]he overwhelming weight of the evidence establishes that Curtis first showed seizure and labored breathing symptoms just outside the mall in Terre Haute, Indiana." (Def.'s Reply at 6.)

Comment b to § 175 states in full,

> *b. Place of injury.* The place where the injury occurs is the place where the force set in motion by the actor first takes effect on the person. This place is not necessarily that where the death occurs. Nor is it the place where the death results in pecuniary loss to the beneficiary named in the applicable death statute.

Restatement (Second) of Conflict of Laws § 175 cmt. b (1971). The Second Restatement's approach to this issue accurately reflects the general consensus in reported decisions. *See* E. H. Schopler, Annotation, *What Is Place of Tort Causing Personal Injury or Resultant Damage or Death, for Purpose of Principle of Conflict of Laws that Law of Place of Tort Governs*, 77 A.L.R.2d 1266 § 11 (1961) ("Where the question relates to the choice between the law of the place in which the fatal injury was inflicted and the law of the place in which the resulting death took place, it is settled . . . by practically all the decisions upon the point, that the place of the tort . . . is the place where the fatal injury was inflicted and not the place where the resulting death occurred.").

In an approach suggested by TransCor in its reply brief, the court assumes for purposes of its choice of law analysis that there was an injury in this case, *e.g.*, a "force set in motion by [TransCor]" that affected Curtis. Specifically, the court assumes that Curtis died of heat stroke, and that the heat stroke was caused, at least in part, by excessive temperatures in the prisoner compartment of the Transporter. Of course, it will be Plaintiff's burden to prove these assumptions at trial. If Plaintiff cannot meet this burden, and the court's assumptions are wrong, TransCor will prevail on the question of liability. The choice of law question regarding compensatory damages would then be moot, and TransCor will not have suffered any prejudice by the court's assumptions.

Assuming TransCor's liability, again only for the limited purpose of performing the choice of law analysis with respect to compensatory damages, the task before the court is to

determine the location of the Transporter when the excessive temperatures first started affecting Curtis.

The court begins with the undisputed fact that by the time the Transporter stopped in the Mall parking lot in Indiana, Curtis was in a state of demonstrable distress.  As Boyd and other witnesses testified, Curtis was "unresponsive" while multiple inmates yelled out to the guards, and remained unresponsive while Boyd poured bottles of water on Curtis's neck and checked his pulse.[12]  Boyd testified that these events occurred as the Transporter "was easing to a stop" and "had already pulled off into the parking lot area."

Crouch's GPS testimony identifies the stop in the Mall parking lot as taking place at 11:07:06 a.m., with a preliminary "unexpected" stop on the shoulder of US-150 at 11:06:07 a.m. Approximately 10 minutes before the stop in the Mall parking lot, at 10:57:19 a.m., the Transporter crossed the Illinois/Indiana border.  Because the weight of the evidence demonstrates that Curtis was affected by the excessive temperatures in the Transporter more than 10 minutes before the stop in the Mall parking lot, as discussed in detail below, the court finds that Curtis was injured in the State of Illinois.

As a preliminary matter, the court recognizes that all of the relevant witness testimony is based on general estimates of time, as well as each of the witness's independent recollection of the events.  The court further recognizes that there is conflicting testimony with respect to (1)

---

[12] The court need not determine whether Curtis showed any signs of life during or after the stop in the Mall parking lot, as this factual question is irrelevant to the court's analysis.  The court's finding today that Curtis's injury took place in Illinois leaves open the possibility that Curtis could have died in either Illinois or Indiana.

whether Hayes's notification to the guards also accurately indicates the timing of Curtis's first signs of medical distress, and (2) the length of time between Hayes's notification to the guards and the Transporter's stop in the Mall parking lot. Fortunately, the court need not pinpoint the exact time that Curtis first felt the effects of the heat to resolve the choice of law question now before the court. The only factual question before the court is whether Curtis was first affected by the heat some time before the Transporter crossed the Illinois/Indiana border, which was approximately 10 minutes before the Transporter stopped in the Mall parking lot. The court finds by a preponderance of the evidence that he was.

Four of the prisoners testified that Curtis first showed signs of medical distress well before the Transporter crossed into Indiana. Prisoner Kaminski testified that "several times during the night" Curtis complained to the guards that he "had a hard time breathing," and that Curtis was "very white." (Kaminski Dep. at 10-11.) Prisoner Coleman testified that Curtis did not eat or drink at the McDonald's stop,[13] and that Curtis told a guard, "I don't feel good.," when the guard came by to pick up the trash. (Coleman Dep. at 23, 26.) Prisoner Casey testified that Curtis "had foam coming out of his mouth and white mucus coming out of his nose" at the McDonald's stop. (Casey Dep. at 7.) Prisoner Davisson testified that Curtis "slumped over" in his seat "probably around 9-ish, between 9 and 10, I believe." (Davisson Dep. at 14.) On the other hand, the record also contains evidence that tends to show that Curtis was not suffering

---

[13] TransCor argues that Curtis's failure to eat is not evidence of a medical condition, citing Curtis's letters from prison to his partner, Richard Maldonado, as evidence that it was Curtis's habit to "not to eat much breakfast." (Def.'s Reply at 4-5, n.6; Def.'s SMF ¶ 6.) The cited letter states, in relevant part, "I get up at 5:00 a.m. do chores that take 2 minutes, then eat breakfast. I eat part of it. Never have been a person who ate much at that time." (Def.'s Ex. 7 at 3.) Although the court expresses no opinion on the admissibility of Def.'s Ex. 7 at this time, it would seem from the cited letter that Curtis's habit was actually to eat breakfast, not to abstain.

from heat stroke around the time of the McDonald's stop, including Hayes's recollection that

Curtis was "just sweating bad" and going "in and out" of sleep, (Hayes Dep. at 18), and the fact

that Curtis signed for his medications in Boyd's presence without leaving any memorable

impression on Boyd. (Def.'s SEALED Ex. 28; Boyd Dep. at 51-52.) Nevertheless, there is at

least some evidence that Curtis was feeling the effects of the heat long before Hayes's

notification to the guards.

Additionally, each of the inmates who estimated a time frame between Hayes's

notification to the guards and the Transporter's stop in the Mall parking lot estimated that at least

18 minutes passed between the timing of these two events. Prisoner Hayes testified that it took

Boyd "about five to seven minutes" to check on Curtis after Hayes's notification to the guards,

and that the Transporter stopped in the Mall parking lot "another 13 to 15 minute" later. (Hayes

Dep. at 53-54.) Prisoner Hayes further testified that "at least 20 minutes" passed between the

time when Curtis first started seizing and the Transporter's stop in the Mall parking lot. (*Id.* at

19-21.) Prisoner Kaminski testified that the guards responded to Hayes's notification of Curtis's

distress by stating that they "would be in Terre Haute[14] in about a half an hour," and he recalled

that "it took a while" between Hayes's notification to the guards and the time that the

Transporter stopped in the Mall parking lot, because "[t]hey were looking for some place to

---

[14] While it is unclear whether this reference to "Terre Haute" refers to the correctional center or the town, the distinction is largely immaterial. FCC Terre Haute is 2.6 miles from the Mall, and it only took the Transporter approximately 7 minutes to drive from the Mall to the parking lot outside of FCC Terre Haute. (Crouch Aff. ¶¶ 14-15.) Factoring in an additional 10 minutes of travel time from the Illinois/Indiana border to the Mall leads to the conclusion that, at most, FCC Terre Haute is 17 minutes from the Illinois/Indiana border. Assuming that the guards were referring to FCC Terre Haute, and not the Mall, the "half an hour" comment still would have reflected a significant amount of time (13 minutes) in Illinois before reaching the Indiana border.

park." (Kaminski Dep. at 15-16.) Prisoner Harrison estimated that most likely "a half hour" passed between the time Hayes notified the guards and the time the Transporter stopped in the Mall parking lot, but that this time frame could have been "anywhere from a half an hour to an hour." (Harrison Dep. at 15-16.) Prisoner Casey estimated that the time between Hayes's notification to the guards and the Transporter's stop in the Mall parking lot was "over like an hour. Hour and a half somewhere," or "a long time." (Casey Dep. at 10-11.)[15]

Boyd testified that there was essentially no gap in time between Hayes calling out, Boyd entering the secured prisoner area, and the Transporter stopping in the Mall parking lot:

Q.    . . . Tell me what the first thing is that gave you pause or brought to your attention that something was going wrong in the back of the bus?

A.    I heard an inmate yell out. I'm not exactly sure what he said. I was sitting in the seat facing the sleeping berth. When I jumped up, I hollered for Master Sergeant Evans to get up out of the bunk. When he got up, I opened up the cage or the first compartment door. He secured it behind me. I unlocked the second compartment door, stepped in there. The inmate that apparently hollered out was sitting beside the – Mr. Curtis. I – they was hooked together by an interconnect system. I unhooked them, had him sit back in one of the other chairs that was empty. And that's when I did a pulse, and I checked on his chest, listening for a heart beat,

_____

[15] Prisoner Coleman's cited testimony does not address Hayes's notification to the guards. Rather, prisoner Coleman testified that Boyd checked Curtis's pulse and poured water on Curtis in response to prisoner Coleman getting out of his seat and notifying the guards that Curtis was in distress. (Coleman Dep. at 27-29, 76.) Prisoner Coleman further testified that, at that time, Boyd "said that we would be in Terre Haute in about an hour and a half." (*Id.* at 29.)

Three inmates who filled out Mass Interview Forms, but who were not deposed, also referred to Curtis's suffering in terms of a specific time period. Prisoner Lewis stated that Curtis was "sick/shaking about 1 hr before we got in." (Def.'s SEALED Group Ex. 1 (Reply).) Prisoner Hannan stated that he knew Curtis was unresponsive "As soon as we came off the exit. About 10 or 15 minutes before we got here." (Def.'s SEALED Group Ex. 45.) Prisoner Leal stated that Hayes was yelling for "about 45 minutes or an hour." (*Id.*) The court gives these varying accounts little weight on this specific question of fact, however, due to their lack of development through deposition testimony.

and to see if I could feel a breath of air on my cheek.

Q.      . . . Now, did you go back there before the bus had stopped?

A.      I'm not exactly sure where he was at, but he was easing to a stop in that place where it had all them buildings and that. I didn't know whether it was a shopping center or a mini mall or whatever it was until after the fact, after it was all over with.

(Boyd Dep. at 59-60.) Boyd did not identify any particular time that these events occurred. On the other hand, Evans estimated that Hayes first shouted out "around 11:00." (Evans Dep. at 46.) Evans further testified that, when he called TransCor management, "we were very close to [FCC-Terre Haute]." (*Id.* at 50-51.) Likewise, Jeffreys testified that Evans instructed him to pull over "around 11:00." (Jeffreys Dep. at 14-15.) Contrary to Boyd's testimony, Robinson testified that at the time of "the commotion," the Transporter "was still moving" and did not "feel like it was ready to stop." (Robinson Dep. at 52-54.)

It is difficult to reconcile the testimony of the four TransCor employees who were on the Transporter, especially when viewed alongside Couch's GPS testimony. If the court accepts Boyd's testimony that the Transporter was pulling to a stop in the Mall parking lot at the same time that Boyd entered the secured prisoner area, this event must have occurred at 11:07:06 a.m. If the court also accepts that Boyd entered the secured prisoner area immediately upon hearing Hayes call out, this event also must have occurred at 11:07:06 a.m. This is contrary, however, to Evans's testimony that Hayes called out around 11:00 a.m. It is also contrary to Jeffreys's testimony that Evans told him to pull over around 11:00 a.m., which would have been 7 minutes *before* Hayes called out. Finally, it is contrary to Robinsons's testimony that the Transporter was still moving when Boyd checked on Curtis.

On the other hand, if the court accepts that Hayes did call out around 11:00 a.m., and that

22

Evans also simultaneously told Jeffreys to pull over, then it took approximately 7 minutes for the Transporter to come to a stop. That means that either (1) Boyd must have waited 7 minutes after Hayes called out before checking on Curtis, if the Transporter was stopped when Boyd checked on Curtis, or (2) Boyd responded immediately to Hayes calling out, and the Transporter was actually still moving when Boyd checked on Curtis. In any event, Boyd's testimony cannot be reconciled in its entirety with that of the other TransCor employees.

Of course, both Evans and Jeffreys could have been estimating when they testified that the relevant events occurred "around 11:00." If that is the case, the court cannot rely on this testimony as an accurate indicator of the timing of events. Additionally, and more important, the court cannot guess whether the relevant events actually occurred slightly later, and more in line with Boyd's testimony, or slightly earlier, and more in line with the prisoners' testimony. As stated above, the court recognizes that all of the witnesses in this case necessarily relied on their own best estimate of the relevant time frame, and the court does not fault the TransCor employees for failing to be more precise. Unfortunately for TransCor, however, the time frame of "around 11:00" leaves very little room for doubt. Less than three minutes before 11:00 a.m., the Transporter was in the State of Illinois.

Having reviewed all of the relevant evidence, and applying a preponderance of the evidence standard, the court finds it more probably true than not that Curtis was first affected by the excessive temperatures in the Transporter while still in the State of Illinois. The presumptive law on compensatory damages is thus Illinois law, unless another state has a greater or more significant relationship to the dispute and the parties. *Townsend*, 879 N.E.2d at 903.

3.    The §145 Factors

### A.     Place of Injury

As discussed in detail above, the court has determined that the place of injury in this case was the State of Illinois.  The court has previously acknowledged that the location of Curtis's injury was "somewhat fortuitous" on June 23, 2009, in light of Curtis's lack of control over "how and when he was transported or where he became ill."  (03/29/2012 Order at 12.)  On the other hand, TransCor "regularly moves through [Illinois] as part of its operations," and TransCor intentionally chose a travel route through Illinois on June 23, 2009.  (*Id.*)  As noted by the parties, approximately 37% of the travel route was through the State of Illinois.  (Def.'s Mem. at 4; Pl.'s Choice of Law Resp. at 11, n.12.)  Moreover, TransCor acknowledges that "[e]ven if the location of the injury was fortuitous, the presumption is still to apply the law of the place of injury."  (Def.'s Mem. at 3 (citing *Burlington N. & Santa Fe Ry. Co. v. ABC-NACO*, 906 N.E.2d 83, 92 (Ill. App. Ct. 2009)).)

The court finds that this factor supplies some support for applying Illinois law.

### B.     Place Where the Conduct Causing the Injury Occurred

The court has previously found that alleged misconduct took place in both Illinois and Indiana.  (03/29/2012 Order at 15.)  In line with the court's assumption that Curtis died of heat stroke caused, at least in part, by excessive heat on board the Transporter, it is clear that at least some of the relevant conduct took place in Illinois. For example, the Transporter was in Illinois when Evans contacted TransCor's headquarters regarding the malfunctioning air conditioner and the decision was made to continue the trip to FCC Terre Haute.  The Transporter was also in Illinois when Hayes notified TransCor personnel that Curtis was having seizures.  As far as TransCor's response to Hayes's notice, it appears from the record that some conduct likely

occurred in Illinois (such as Boyd "holler[ing] for Master Sergeant Evans to get up out of the bunk") while other conduct occurred in Indiana (the Transporter's stop in the Mall parking lot). It is unclear whether the Transporter was in Illinois or Indiana when Boyd first checked on Curtis, but it appears that the Transporter was in Indiana when the decision was made to continue from the Mall to FCC Terre Haute.

After considering all of the relevant conduct, the court finds that this factor favors both Illinois and Indiana.

### C.      Residence of the Parties

The residence of the parties is often a compelling factor when courts are faced with a choice of law question on the issue of damages.  Section 178 of the Second Restatement makes clear that "[t]he law selected by application of the rule of § 175 determines the measure of damages in an action for wrongful death."  Restatement (Second) of Conflict of Laws § 178 (1971).  In other words, "the local law of the state where the injury occurred" is the presumptive governing law.  The comments to § 178 acknowledge, however, that "the state of conduct and injury" is not necessarily the state "which is primarily concerned with the measure of damages in a wrongful death action."  *Id.* (comment b).  In applying the § 6 principles to select the state with the "dominant interest in the determination of this issue," comment b suggests that "the state[s] of the domicil of the defendant, the decedent and the beneficiaries" may have a greater interest in the determination of the measure of damages.  *Id.* (comment b).[16]

_____

[16] In full, comment b to § 178 states:

The choice-of-law principles stated in § 6 should be applied in determining the state whose local law will be applied to determine the measure of damages in a wrongful death action. In general, this should be the state which has the dominant interest in

In this case, however, this factor is unusually weak. Simply put, no party is a resident of either Illinois or Indiana: Curtis was a resident of Iowa, Plaintiff is a resident of Minnesota, and TransCor is incorporated in and headquartered in Tennessee. No party has argued that any of these states has a conflict with Illinois law on the issue of compensatory damages. (*See* Pl.'s Choice of Law Mem. at 12 n. 38-39.)

TransCor argues that "a federal prisoner who is about to take up residency at a prison in Indiana surely has a connection to Indiana that exceeds his ties to the various states through which he travels to get here." (Def.'s Mem. at 5.) At most, then, it could be argued that Curtis intended to become a resident of Indiana. This argument has generally been rejected in other contexts. *See, e.g., Maksym v. Bd. of Election Com'rs of City of Chi.*, 950 N.E.2d 1051, 1060 (Ill. 2011) ("to *establish* residency, two elements are required: (1) physical presence, and (2) an intent to remain in that place as a permanent home") (emphasis in original). Curtis had not yet established a physical presence in Indiana at the time of his injury, and it is debatable whether the court should consider Indiana his intended permanent home.

Altogether, the residence of the parties does not support the application of either Illinois law or Indiana law.

---

the determination of this issue. The state of conduct and injury will not, by reason of these contacts alone, be the state which is primarily concerned with the measure of damages in a wrongful death action. The local law of this state will, however, be applied unless some other state has a greater interest in the determination of this issue. In a situation where one state is the state of domicil of the defendant, the decedent and the beneficiaries, it would seem that, ordinarily at least, the wrongful death statute of this state should be applied to determine the measure of damages.

**D.        Place Where the Relationship Between the Parties Was Centered**

This court has previously found that the relationship between TransCor and Curtis was not "centered" in any one location, noting "[Curtis's] contact with TransCor's agents took him through four states.  It is a stretch to say that TransCor's relationship with [Curtis] was centered in Illinois or Indiana merely because that is where [Curtis] became deathly ill."  (03/29/2012 Order at 16.)  As in its previous choice of law opinion, the court affords little weight to this factor.

**E.        Preliminary Determination**

Considering all of the § 145 factors, as discussed above, the court finds that the State of Indiana does not have a greater or more significant relationship to the dispute and the parties than the State of Illinois.  The court concludes at this preliminary stage of the analysis that Illinois law should apply to the determination of compensatory damages.  The court will next test this determination in light of the policy factors of § 6.

4.        The §6 Principles

As this court has previously explained, of the seven § 6 principles, only two apply in this case: (b) the relevant policies of the forum; and (c) the relevant policies of other interested states and the relevant interests of those states in the determination of the particular issue.  (03/29/2012 Order at 17.)


The forum state in this case, Illinois, is the state in which Curtis was injured.  Illinois does not cap damages awarded for the loss of love and companionship.  *Townsend*, 879 N.E.2d at 907 (noting "the absence of a statutory cap on compensatory damages for noneconomic

injuries in Illinois"). Illinois also permits survival actions, such that "actions to recover damages for an injury to the person" survive his or her death and damages inure to the benefit of the decedent's estate. 755 ILCS 5/27-6. Finally, Illinois law permits compensatory damages for a surviving heir's "grief, sorrow, and mental suffering." 740 ILCS 180/2.[17] In short, Illinois law favors generous damages awards for prevailing plaintiffs in wrongful death actions. If the purpose of Illinois' policy is to compensate the victim for his or her injuries, however, Illinois' interest in this case is diminished when neither party is an Illinois resident.

Indiana has an interest in the case, as the state where some relevant conduct occurred. Indiana law makes clear that, "[i]n an action to recover damages for the death of an adult person, the damages . . . may not include . . . damages awarded for a person's grief." Ind. Code § 34-23-1-2(c)(2)(A). Moreover, "[a]ggregate damages [for loss of the adult person's love and companionship] may not exceed three hundred thousand dollars," and "[a] parent or child who wishes to recover damages under this section has the burden of proving that the parent or child had a genuine, substantial, and ongoing relationship with the adult person before the parent or child may recover damages." Ind. Code § 34-23-1-2(e)-(f). Indiana law also makes clear that a cause of action for "personal injuries to the deceased party" does not survive that person's death. Ind. Code § 34-9-3-1(a)(6). In short, Indiana's approach favors limited compensatory damages in wrongful death actions. If the purpose of Indiana's approach is to protect defendants from

---

[17] Neither party has addressed the fact that some Illinois courts take a position contrary to the plain language of the statute. *See, e.g., Watson v. S. Shore Nursing & Rehab. Center, LLC*, 2012 WL 470158, at *6 (Ill. App. Ct. 1st Dist. Feb. 10, 2012) ("loss of society does not include the grief and mental anguish resulting from the death, and such damages are therefore not recoverable in a wrongful death suit"). The court relies on the plain language of the statute in its formulation of Illinois law on this point.

excessive compensatory damages, however, Indiana's interest in this case is diminished by the fact that TransCor is not a resident of Indiana.

Other states with a potential interest in this case are: Iowa (where Curtis was a resident), Minnesota (where Plaintiff is a resident), and Tennessee (where TransCor is headquartered).

Tennessee has the strongest interest in protecting its resident business, TransCor, from excessive compensatory damages. The policies of Tennessee, however, are more in line with Illinois law than with Indiana law, including no cap on compensatory damages, the availability of survival actions, and "consortium-type damages" for the loss of a parent. *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 601-602 (Tenn. 1999) ("Consortium losses are not to limited to spousal claims but also necessarily encompass a child's loss, whether minor or adult."); *see also* Tenn. Code Ann. § 20-5-106; Tenn. Code Ann. § 20-5-113. TransCor has not argued that Tennessee law conflicts with Illinois law, or that Tennessee law should be applied on the issue of compensatory damages.

Minnesota has the strongest interest in regulating the amount of damages awarded its resident plaintiffs. Like Illinois, Minnesota has no cap on compensatory damages and allows for the recovery of loss of society, advice, comfort, and protection caused by the death of a parent, in addition to permitting survival actions. Minn. Stat. § 573.02, subd. 1 ("[t]he recovery in the action is the amount the jury deems fair and just in reference to the pecuniary loss resulting from the death"); *see also Youngquist v. W. Nat'l Mut. Ins. Co.*, 716 N.W.2d 383, 386 (Minn. App. Ct. 2006) ("The supreme court expanded the concept of 'pecuniary loss' to include loss of aid, advice, comfort, and protection."). On the other hand, like Indiana, Minnesota does not allow for the recovery of a decedent's pain and suffering endured before death. *Tiedeken v. Tiedeken*,

363 N.W.2d 909, 910 (Minn. App. Ct. 1985) ("A wrongful death claim, unlike a claim for personal injuries, does not include compensation for pain and suffering."). Neither party has argued that Minnesota law conflicts with Illinois law, or that Minnesota law should be applied on the issue of compensatory damages. Plaintiff takes the position that "the application of Illinois law relating to compensatory damages will protect the interests of . . . Minnesota in ensuring its residents are adequately compensated for their injuries." (Pl.'s Mem. at 14.)

Having considered the relevant § 6 principles, the court concludes that no state with conflicting laws has a greater or more significant relationship to the dispute and the parties than the State of Illinois on the issue of compensatory damages, and the court will therefore apply Illinois law.

## II.      LEAVE TO SEEK PUNITIVE DAMAGES UNDER RULE 54(C)

On March 29, 2012, this court denied Plaintiff leave to file an amended complaint for purposes of adding a request for punitive damages. At that time, however, the court "reserve[d] ruling . . . as to whether [Plaintiff] can nonetheless pursue punitive damages under Fed. R. Civ. P. 54(c)." (03/29/2012 Order at 1.) The court noted,

> Requests for punitive damages are not claims, and . . . under Fed. R. Civ. P. 54(c) a final judgment should grant the prevailing party the relief to which he is entitled, even if that party has not demanded that relief in his complaint. This rule is to be liberally construed, but it has limitations. *Kaszuk v. Bakery and Confectionary Union and Indus. Int'l Pension Fund*, 791 F.2d 548, 559 (7th Cir. 1986). In particular, the court may consider whether the opposing party would be prejudiced, such as by a substantial increase in its potential liability. *Id.*

(03/29/2012 Order at 7.) The court directed the parties to brief the Rule 54(c) issue, and that briefing has now been completed.

TransCor argues that it would be prejudiced in two ways by the introduction of punitive

30

damages in the case at this stage of the litigation.  First, TransCor argues that it would face "dramatically increased liability exposure."  (Def.'s Mem. at 12.)  Second, TransCor argues that "the presence of such a claim — and a better understanding of the factual predicate for it — would have caused Defendant to prepare differently."  (*Id.*)  The court is not persuaded by TransCor's arguments.

TransCor's litigation approach was informed by its own assessment of the value of Plaintiff's case, which it considered to be "a relatively low-dollar wrongful death action."  (*Id.* at 12.)  Nevertheless, TransCor also recognized that ultimately "the jury will be asked to choose from two irreconcilable accounts of the trip."  (*Id.* at 13.)  TransCor admits that it was aware of the testimony of various prisoners who claimed that Curtis was distressed "during the hours spent in Illinois," but that it "never put any stock or [gave] weight" to these assertions.  (*Id.*)  Rather, TransCor concluded from the evidence uncovered in discovery that the jury "will accept Defendant's version."  (*Id.*)

Plaintiff alleged that "Transcor's [sic] employees were notified that Joseph was in need of medical attention due to exposure to excessive heat," but "failed to take the necessary actions to address Joseph's deteriorating health condition."  (Pl.'s Compl. ¶¶ 10-11.)  As the court noted in its previous order, these allegations "go beyond mere negligence" and suggest "that TransCor employees ignored indications that [Curtis] was in distress."  (03/29/2012 Order at 8.)  The court finds that a proper defense to these allegations would have adequately uncovered any "facts suggesting the lack of intentional, malicious, and reckless conduct" in the discovery process.  (Def.'s Mem. at 13.)  Moreover, as a corporation headquartered in Tennessee, where a significant portion of relevant events took place, TransCor should had known that punitive

damages were a possibility.  Despite the increase in potential exposure to damages, which is undoubtedly a factor, the court concludes that TransCor was not unduly prejudiced in its ability to defend against a punitive damages request.  The court will therefore permit Plaintiff to pursue punitive damages at trial.

CONCLUSION

For the reasons set forth above, "Plaintiff's Motion for Determination of Choice of Law Relating to the Issues of Liability and Compensatory Damages" (Dkt. No. 155) is granted; "Plaintiff's Motion to Allow Punitive Damage Relief Under Rule 54(c)" (Dkt. No. 169) is granted; and "Defendant TransCor America, LLC's Motion for Application of Indiana Law on Liability and Compensatory Damages and Inapplicability of Rule 54(c) Relief" (Dkt. No. 171) is denied.  Trial dates remain as scheduled at June 28, 2012 status hearing.  The parties are encouraged to discuss settlement.

ENTER:

JAMES F. HOLDERMAN
Chief Judge, United States District Court


Date: June 28, 2012